NOT DESIGNATED FOR PUBLICATION

No. 113,832

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of D.L.,
DOB XX/XX/2011.

MEMORANDUM OPINION

Appeal from Washington District Court; WILLIAM B. ELLIOTT, judge. Opinion filed December 11, 2015. Affirmed.

*Meghan K. Voracek*, of O'Keefe Law Office, of Seneca, for appellant natural mother.

*Richard E. James*, special prosecutor, for appellee, and *Kelly Navinsky-Wenzel*, guardian ad litem, of Bolten and McNish, LLC, of Clay Center.

Before BUSER, P.J., LEBEN and BRUNS, JJ.

*Per Curiam*:  J.H. (Mother) appeals the district court's termination of her parental rights to her son, D.L., who was approximately13 years old at the time of the termination. D.L.'s father has voluntarily relinquished his parental rights to D.L. and is not a party to this appeal. This is a companion case to *In re A.L.H*, No. 113,589, and *In re I.H. IV*, No. 113,590, involving the consolidated appeals of the termination of Mother's parental rights to her two other children who had a different father than D.L., referred to as Stepfather.

In this appeal, Mother contends that the district court erred in three ways:  (1) there was not clear and convincing evidence to support the termination; (2) the presiding judge should have recused himself; and (3) she should have been granted a continuance of the termination hearing. We find, however, that there is substantial evidence in the

1

record to support the district court's finding that there was clear and convincing evidence establishing that Mother was an unfit mother due to her incarceration, exposure of her children to criminal activity, and other factors discussed in this opinion. We also find that Mother offered no factual basis to support her allegation that the presiding judge was biased or prejudiced. Lastly, we find that the district court did not abuse its discretion in denying Mother's motion to continue the termination hearing. Thus, we affirm the district court's termination of Mother's parental rights to D.L.

FACTS

On March 4, 2014, the State petitioned the district court to find that D.L. and his two half-brothers, A.L.H. and I.H., IV, to be children in need of care (CINC). A few days earlier, D.L.'s Mother and Stepfather were arrested after law enforcement officers executed a search warrant at their home and found a crystalline substance that was either ecstasy or methamphetamine as well as between 45 and 50 grams of marijuana. In addition, officers also found surveillance equipment, scales, and empty baggies during the search. It was alleged that the drugs were found in areas accessible to the children. Moreover, officers obtained the search warrant after a minor reported that he had purchased marijuana from Stepfather at the home.

On the same day the State filed the CINC petition, the district court entered an order appointing a guardian ad litem on behalf of D.L. The following day, the district court entered an order removing D.L. from Mother's custody and placing him in temporary custody of the State. On March 13, 2014, the district judge initially assigned to this case recused himself because of a conflict of interest with possible witnesses. The Kansas Supreme Court appointed Senior Judge William B. Elliott to hear the termination proceedings for all three children as well as one of Mother's criminal cases.

On May 7, 2014, the district court entered a journal entry and order of adjudication finding that D.L., as well as A.L.H. and I.H., IV, were children in need of care. On May 22, 2014, the district court entered an order of disposition approving and adopting the proposed permanency plan with a goal of reintegration. At some point, Mother and Stepfather were released on bond and moved into another residence.

On July 29, 2014, law enforcement officers obtained a warrant to search Mother and Stepfather's new residence. During this search, methamphetamine, marijuana, and drug paraphernalia were found. As a result, Mother and Stepfather were arrested again, and it appears that they were unable to bond out of jail following this arrest. In August 2014, Mother was convicted of possession of marijuana with intent to distribute. The following month, she was also convicted of felony possession of drug paraphernalia with intent to manufacture or grow. She was subsequently sentenced to 32 months in prison, and her earliest possible release date is July 10, 2016.

On November 3, 2014, the district court held a review hearing. At the conclusion of the hearing, the district court found that reintegration of the children into the home may not be a viable option due to the incarceration of both Mother and Stepfather. Another review hearing was held on December 9, 2014, at which time the district court found Mother's progress was inadequate and that reintegration was no longer a viable option.

On January 6, 2015, the State filed a motion to terminate Mother's parental rights to D.L. and her other children. On the same day, attorneys representing the various parties agreed to schedule a hearing on the termination motion for January 23, 2015. A week before the scheduled hearing, Mother filed a motion for continuance so that an Interstate Compact on the Placement of Children (ICPC) investigation for "possible placement/permanent custodianship of the minor children with their paternal aunt" could be completed. Two days later, Mother also filed a motion to disqualify the presiding

3

judge. In her motion, Mother argued that the judge had a personal bias against her because he had also presided over her criminal cases in 2014.

The State filed a response to Mother's motion for continuance on January 20, 2015, arguing that the ICPC investigation should have no effect on the result of the termination hearing because the search for long-term placements for the children would continue regardless of whether the court terminated Mother's parental rights. The State also argued that six lawyers had agreed to the date of the hearing and that several witnesses had been subpoenaed to testify on January 23, 2015. The district court entered an order denying Mother's motion for a continuance on January 20, 2015. In the same order, the presiding judge denied Mother's motion to disqualify.

At the termination hearing, the State called three social workers, two therapists, and one police officer to testify. Brandi Lewis—a social worker specialist with the Kansas Department for Children and Families (DCF) (previously the Kansas Department of Social and Rehabilitation Services)—testified about DCF's prior contact with Mother. In March 2004, a member of the community found D.L.—who was 2 years old at the time—walking outside unattended and reported it to law enforcement. The family thereafter accepted family preservation services from DCF. After concerns in 2005 that Mother was not using the skills that she had learned in those parenting classes, DCF recommended that she complete additional classes with family preservation services, but Mother refused.

According to Lewis, DCF initiated an investigation in January 2007 because D.L. had broken out windows in a truck, which evidently led to criminal charges and court-ordered family preservation services. In December 2011, there was a report that D.L. threatened to bring a gun to school and shoot some of his peers. However, Mother explained that D.L. was simply responding to threats made toward him, and DCF closed the investigation.

4

Lewis further testified that during an investigation into possible physical abuse of A.L.H. in January 2014, the children told an investigator that Stepfather had recently pointed a gun at Mother's head and that they had called 911 because they were afraid. Mother admitted that this occurred, but she told the investigator that it was a pellet gun which they no longer had. Lewis stated that because DCF was unable to view the gun, they could not substantiate the report. All three children, however, were eventually placed in police protective custody in March 2014 after law enforcement officers executed the search warrant on Mother and Stepfather's home.

Lewis recounted that sometime after the Mother and Stepfather were released on bond following their arrest, they moved to a different residence. On July 29, 2014, while the CINC action was pending, law enforcements officers executed a search warrant at the new residence to search for stolen checks. Instead, they found a scorched glass pipe apparatus containing marijuana sitting in an ashtray in the main dining area. After obtaining another search warrant covering illegal narcotics, officers searched the residence again and found two baggies of methamphetamine, a large amount of marijuana, and drug paraphernalia.

Tom Anderson, a family support worker, testified about supervised visits he conducted between the children and Mother and Stepfather. During one visit, he observed A.L.H. trying to kick a goat and a chicken, but neither Mother nor Stepfather tried to stop him from hurting the animals. During another visit, Anderson refused to let the boys continue playing a violent video game that Mother had bought for them. Anderson observed that when the children began arguing, they would immediately begin punching each other. He described their fighting as "just vicious" and beyond typical sibling fighting. While monitoring another visit, the children asked if they could fight each other with Roman candle fireworks and Stepfather told them to ask Anderson if it was okay, who told them they could not do so.

5

Rascheal Nutsch, a social worker and case manager with St. Francis Community Services, testified about some home videos that Stepfather posted on YouTube. In one video, Stepfather had the front wheel of a motorcycle braced against a tree outside the home and the back tire was on the sidewalk. Stepfather was burning out the tire on the motorcycle, and at one point, A.L.H. walked around the back of the motorcycle shortly before the tire exploded. Mother was present in the video, and she can be seen removing a child from the area. In another video, an unknown person is shocked by a taser device that is attached to a chair. A.L.H. states in the video that he had previously been tased in the chair.

When Nutsch asked the parents about the videos, she stated that they "just kind of laughed and didn't take it serious." Moreover, when Nutsch spoke with Stepfather about the children playing violent video games, he told her that they would not let the children play the games while someone from DCF was present. However, Stepfather told her that they would let the children play the games when representatives from DCF were not present.

Nutsch also testified that Mother and Stepfather's case plan required them to, in part, remain sober, maintain employment, and provide verification of their employment. Mother passed all of her drug tests; and except for the first urinalysis test, Stepfather did not test positive for drugs. However, police recovered a prosthetic penis and tubing during the search of their home on July 29, 2014. Stepfather later admitted to using the prosthetic penis to provide clean urine; and after initially denying doing so, Mother later admitted to providing the clean urine for Stepfather.

In addition, Nutsch stated that the parents "always had money to give the kids, always had money to buy the kids things, always had new motorcycles at visits, new this, new that" but that DCF was unable to account for the parents' income. When she asked them how they earned a living, they told her that they were cleaning pastures and

cleaning houses—"under-the-table" type of jobs, which Nutsch stated did not account for all of their money. When asked on cross-examination, Nutsch stated that Mother's parenting style and interaction with the children was "more age-appropriate" and "more on the child[ren]'s level" than Stepfather's.

Shane Stadtler, a therapist, testified in regards to his therapy sessions with Mother and Stepfather. He stated that they only attended a few sessions before they quit going. Mother and Stepfather were reluctant to tell him about their case; and when Stadtler asked them about their marijuana use, Mother and Stepfather told him that it was not a problem because they believed that it should be legalized. At some point, however, Mother told Stadtler that she had quit using drugs because she understood that their drug use was the reason she did not have custody of her children.

Carly Bloomfield, a therapist who provided weekly care for the three children, also testified. Bloomfield stated that she was concerned about the physical and verbal aggression amongst the siblings. She stated that their aggression was more severe than typical sibling fighting and that several times during sessions she needed help to separate the children. Bloomfield stated that based on her training and experience, the children's behavior indicated that they had been exposed to several instances of domestic violence. At one point during treatment, the children told Bloomfield that they had been whipped with a belt.

According to Bloomfield, A.L.H. and I.H., IV told her that they had witnessed Stepfather beat Mother. I.H., IV, told Bloomfield that Mother would cheat on Stepfather and, as a result, Stepfather would hit her. All three children told Bloomfield that they were afraid that someone was going to die when Stepfather held the gun to Mother's head. On direct examination, Bloomfield stated that A.L.H. had come downstairs and witnessed Mother and Stepfather having sex. On cross-examination, she clarified that A.L.H. saw them having sex in their bedroom through a cracked door. Bloomfield stated

7

without elaboration that A.L.H. also witnessed Mother engage in "sexual acts" with men other than Stepfather.

Bloomfield also testified that the children told her that they were aware that their parents were selling drugs in the house, that they knew where the drugs were located, that they recognized several people who came to their house to buy drugs, and that their parents told them not to tell anyone about the drugs because they would get in trouble. When Bloomfield told the children that their parents had been arrested the second time, D.L. ran outside, punched a trashcan, and stated that he did not want to see them again and that he was tired of them making bad choices. Bloomfield reported that she was no longer seeing D.L. but that A.L.H. and I.H., IV, were making significant progress in therapy.

Bloomfield stated that when the children were removed from Mother's custody, Mother wrote the children almost daily. Bloomfield eventually told Mother to stop writing so many letters to the children because DCF "couldn't keep up with giving them to the children and it was overwhelming them." Mother continued to write the children letters at the rate Bloomfield requested. Bloomfield also testified that Mother had taken advantage of every opportunity to speak with her children on the phone. At one point, there was evidently a problem with the children, and Bloomfield asked Mother to speak with them to resolve the problem.

During the hearing, Mother primarily testified about the progress she had made while incarcerated. She enrolled in a program that helps mothers reintegrate with their minor children shortly before release. The program requires drug testing and treatment during and after imprisonment and also helps women obtain stable employment, a place to live, and counseling for domestic violence. In addition, Mother completed a substance abuse rehabilitation program interview and was placed on a waiting list for that program as well as for several parenting classes. In November 2014, Mother obtained a certificate

8

from Washburn Tech for forklift operator safety training. She also received certification as a production technician.

Mother also testified about conversations she had with Nutsch and Stadtler. Mother claimed that 2 days before the termination hearing, Nutsch told her that she had been doing well and was on a good path toward reintegration. Mother explained that she quit attending therapy with Stadtler because she thought that he had told her that he would not speak with DCF without first talking to her, but Stadtler nonetheless spoke with Bloomfield and told her that Mother and Stepfather were not participating in therapy. Mother asserted that her request for a different therapist was denied. Nutsch confirmed that Mother had told her that she no longer wanted to see Stadtler, and Nutsch testified that she told Mother try to find another therapist. When asked if Mother was trying to avoid therapy, Nutsch responded, "[P]er se, no."

On May 4, 2015, the district court entered an order finding Mother unfit and terminating her parental rights to D.L. In addition, the district court terminated Mother's parental rights to A.L.H. and I.H., IV. Specifically, the district court found that it was unlikely that Mother's conduct or condition would change in the foreseeable future and that termination was in the best interests of the children.

ANALYSIS

*Termination of Mother's Parental Rights*

On appeal, Mother contends that there was not clear and convincing evidence presented at the evidentiary hearing to justify the termination of her parental rights to D.L. Moreover, she contends that termination was not in D.L.'s best interests. In reviewing a district court's termination of parental rights, this court considers "whether, after review of all the evidence, viewed in the light most favorable to the State, [we are]

convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that [the parent's rights should be terminated]." See *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). *In B.D.-Y.*, the court explained that "clear and convincing evidence" requires the factfinder to believe "that the truth of the facts asserted is highly probable." 286 Kan. at 697. We do not, however, weigh conflicting evidence, determine the credibility of witnesses, or redetermine factual questions on appeal. 286 Kan. at 705.

After a district court has adjudicated a child to be a child in need of care, the district court must make three findings before terminating parental rights. The district court must find by clear and convincing evidence that (1) the parent is unfit; (2) the conduct or condition that renders the parent unfit is unlikely to change in the foreseeable future; and (3) the termination of parental rights is in the best interests of the child. K.S.A. 2014 Supp. 38-2269(a), (g)(1); *In re M.H.*, 50 Kan. App. 2d 1162, 1169, 337 P.3d 711 (2014). When deciding whether the parent is unfit, the district court must consider a nonexclusive list of factors in K.S.A. 2014 Supp. 38-2269(b). When the child is not in the parent's custody—which is the case here—the district court must also consider four additional nonexclusive factors listed in K.S.A. 2014 Supp. 38-2269(c). Any one of these factors, standing alone, may provide grounds for termination. K.S.A. 2014 Supp. 38-2269(f).

In the present case, we find that there was sufficient evidence to find that Mother was unfit. She was convicted of possession with intent to distribute marijuana and felony possession of drug paraphernalia with intent to manufacture or grow, for which she received a sentence of 32 months in prison. The record reveals that D.L. and his brothers were aware that their parents were selling drugs in the house and that they knew where the drugs were kept in the home. Testimony about a video posted on YouTube indicated that one of the children was shocked by a taser device attached to a chair, and another video indicated that the children were placed in a highly dangerous situation that could

have resulted in serious harm. There was also evidence that A.L.H. witnessed Mother engage in sexual acts with men other than Stepfather.

The evidence presented during the termination hearing also supported the district court's finding that Mother's conduct or condition was unlikely to change in the foreseeable future. Courts view the "'foreseeable future'" element through the child's perspective rather than the parents'. *In re S.D.*, 41 Kan. App. 2d 780, 790, 204 P.3d 1182 (2009). It is important to decide these cases in "'child time'" rather than "'adult time'" so that children do not languish in DCF (SRS) custody. *In re J.A.H.*, 285 Kan. 375, 386, 172 P.3d 1 (2007). This court may predict parents' future unfitness based on their past conduct. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982); *In re J.T.J.*, No. 112,345, 2015 WL 2414453, at *16 (Kan. App. 2015) (unpublished opinion), *rev. denied* 302 Kan. ___ (July 21, 2015).

Here, Mother's earliest possible release date is July 10, 2016, which was between 17 and 18 months after the hearing date. At the time of the hearing, D.L. was approximately 13 years old, and he will be around 15 years old on July 10, 2016. As this court has previously found, "incarceration for as few as 7 additional months from the date of the hearing, along with other factors, was sufficient to establish that the parent's condition would not change in the foreseeable future." *In re S.D.*, 41 Kan. App. 2d at 790.

The most delicate issue appears to be the abuse of Mother by Stepfather and the negative psychological effects it had on D.L. and his half-brothers. On the one hand, it is hard to understand why Mother—who was also a victim of the physical abuse—should have her parental rights severed because of Stepfather's actions. See *In re A.H.*, 50 Kan. App. 2d 945, 950, 334 P.3d 339 (2014) (noting that although Mother was victim of domestic abuse, she "was completely unable or unwilling to address the harm caused to her children witnessing the domestic violence in the house"). Mother testified during the hearing that she was taking part in a program that provides domestic violence counseling

11

services after released from prison. She also stated that she discovered a domestic violence and abuse program 2 days before the hearing, which she planned to attend. Thus, the record suggests that Mother is not unwilling to address the harm D.L. suffers from witnessing domestic abuse.

On the other hand, DCF's long history of contact with Mother reveals that she has had a difficult time adapting her parenting skills. In addition, the record suggest that Mother was unwilling to separate from Stepfather, so the children could be exposed to the same domestic violence in the future. See *In re A.B.*, 12 Kan. App. 2d 391, 392, 746 P.2d 96 (1987) (stating that a parent may be held responsible for failing to take proper precautions to protect a child from abuse even when the parent whose rights are at issue was not implicated in the abuse suffered by a child); *In re T.J.C.-R.*, No. 106,848, 2012 WL 1759828, at *5 (Kan. App. 2012) (unpublished opinion) (terminating Mother's parental rights where Mother refused to remove herself and her children from her physically abusive husband).

Bloomfield testified that the children were "extremely angry and extremely aggressive" toward each other and others, which was likely a result of exposure to several incidents of domestic violence. Indeed, the children indicated to Bloomfield that fighting was a family norm. After Mother and Stepfather were arrested, I.H., IV, told Bloomfield that he no longer had to worry about Stepfather beating Mother because they were in prison. Mother has a natural, common-law, and statutory duty to protect her children from abuse. See *In re S.D.*, 41 Kan. App. 2d at 788-89; K.S.A. 2014 Supp. 21-5601. Further exposure to the same behavior would be damaging to the children.

Even though this is a difficult case,

"[a] parent may be labeled 'unfit' under the law even though he or she loves the child and wants to do the right thing, which may be the case here. But we must judge

12

these cases based mostly upon actions, not intentions, and we must keep in mind that a child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time." *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237, *rev. denied* 286 Kan. 1177 (2008).

Taken as a whole, we conclude that a reasonable factfinder could have found it highly probable that the State had shown by clear and convincing evidence that Mother was presently unfit and likely to remain unfit for D.L.'s foreseeable future.

Lastly, this court must consider whether termination was in D.L.'s best interests. Since this is inherently a judgment call, we review the district court's decision for abuse of discretion. *In re M.H.*, 50 Kan. App. 2d at 1175. A district court abuses its discretion when its decision is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) founded on an error of fact. *Frazier v. Goudschaal*, 296 Kan. 730, 755, 295 P.3d 542 (2013). When determining whether termination was in the child's best interests, the courts must give primary consideration to the child's physical, mental, and emotional health. K.S.A. 2014 Supp. 38-2269(g)(1).

Bloomfield testified that D.L.'s anger and aggressive behavior had decreased significantly since she had been treating him. She stated that after his parents were arrested the second time, D.L. exhibited some aggressive behaviors but eventually improved his behavior. In summary, nothing in the record suggests that the district court abused its discretion by finding that termination was in D.L.'s best interests.

*Failure of District Judge to Recuse*

Mother next contends that the judge who presided over the termination hearing erred in refusing to recuse himself from the proceeding because he had previously presided over her criminal cases. There are three avenues for litigants to seek a trial judge's recusal: (1) the Kansas Code of Judicial Conduct, Supreme Court Rule 601B,

13

Canon 2, Rules 2.2, 2.3 and 2.11 (2015 Kan. Ct. R. Annot. 755); (2) K.S.A. 20-311d(c); and (3) the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *State v. Hurd*, 298 Kan. 555, 568, 316 P.3d 696 (2013). Regardless of which avenue a party uses to seek recusal, appellate courts exercise unlimited review over whether a trial judge's recusal was required. *State v. Moyer*, 302 Kan. ___, 2015 WL 6087211, at * 20 (No. 105,183, filed October 16, 2015).

The United States Supreme Court has explained that the Due Process Clause sets the "'constitutional floor'" for recusal claims, while "'common law, statute, or professional standards of the bench and bar'" represent the ceiling. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 889, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 (2009) (quoting *Bracy v. Gramley*, 520 U.S. 899, 904, 117 S. Ct. 1793, 138 L. Ed. 2d 97 [1997]). Accordingly, most claims of disqualification can be resolved without resorting to the Constitution. *State v. Sawyer*, 297 Kan. 902, 907, 305 P.3d 608 (2013) (quoting *Caperton*, 556 U.S. at 890).

Here, Mother does not make a statutory or due process claim but relies upon only the Code of Judicial Conduct (Code), which provides that "[a] judge shall perform the duties of judicial office impartially, competently, and diligently." Supreme Court Rule 601B, Canon 2 (2015 Kan. Ct. R. Annot. 755). Under Canon 2, Rule 2.11(A)(1) (2015 Kan. Ct. R. Annot. 761) requires that judges disqualify themselves when their "impartiality might reasonably be questioned, including but not limited to" when they have "a personal bias or prejudice concerning a party or party's lawyer, or personal knowledge of the facts that are in dispute in the proceeding."

Notably, the Kansas Supreme Court recently questioned whether the Code is an appropriate basis for recusal. See *Moyer*, 2015 WL 6087211, at * 23 (noting that the Code is not "intended to be the basis for litigants to seek collateral remedies against each other or to obtain tactical advantages in proceedings before a court"). In *Moyer*, however,

14

our Supreme Court noted that the Code previously had been considered as an independent basis for recusal and proceeded to consider the defendant's claim because the State had not argued that it was inappropriate to do so. *Moyer*, 2015 WL 6087211, at * 23. The same is true in this instance.

Initially, the State argues that Mother has failed to preserve this issue for appeal because she did not comply with K.S.A. 20-311d by filing an affidavit alleging grounds for recusal. However, the State's argument is misplaced because Mother's argument below and on appeal does not rely upon K.S.A. 20-311d. Although the plain language of the Code does not require an affidavit, one would certainly have been useful in this case—which perhaps speaks to the appropriateness of a party seeking relief under the Code. Mother simply argues on appeal that the trial judge "could [have] be [been] bias[ed] in this matter" because he presided over Mother's criminal proceedings.

A judge should be disqualified when the circumstances "create reasonable doubt concerning the judge's impartiality, not in the mind of the judge himself, or even, necessarily, in the mind of the litigant filing the motion, but rather in the mind of a reasonable person with knowledge of all the circumstances." *State v. Logan*, 236 Kan. 79, 86, 689 P.2d 778 (1984); see *Moyer*, 2015 WL 6087211, at * 23-24 (relying on *Logan* as a case considering a party's recusal claim under the Code); *State v. Schaeffer*, 295 Kan. 872, 876, 286 P.3d 889 (2012), *cert. denied* 134 S. Ct. 823 (2013). Simply because a judge presided over an earlier case involving the same party is not—in and of itself—a sufficient basis upon which to find a judge to be biased. See *State v. Walker*, 283 Kan. 587, 608, 153 P.3d 1257 (2007) (finding that district judge who presided over the defendant's first trial was not biased in the second trial because he had previously denied his motion for acquittal and motion for acquittal notwithstanding the verdict during the first trial).

The record in the present case indicates that on March 13, 2014, the district judge initially assigned to this case recused himself because of a conflict of interest with possible witnesses. Approximately 1 week earlier, the Kansas Supreme Court appointed Senior Judge Elliott to hear this matter as well as the Mother's criminal cases. But it was not until January 19, 2015—nearly 10 months later and just 4 days before the termination hearing—that Mother filed a motion to disqualify the senior judge. Not only is the timing of Mother's motion suspect, her motion simply alleged that the senior judge had a personal bias because he sentenced her and Stepfather in the criminal drug cases.

We note that nothing in the record suggests that the facts from the Mother's criminal cases were disputed in the termination proceeding. We also note that this court has denied similar claims asserted by parents in termination of parental rights cases. See *In re K.J.S.*, No. 92,742, 2005 WL 331821, at *3-4 (Kan. App. 2005) (arguing that trial judge was prejudiced because he had previously sentenced the mother in a criminal case and had heard her divorce case), *rev. denied* 279 Kan. 1006 (2005); *In re T.F.*, No. 90,173, 2004 WL 90074, at *3 (Kan. App. 2004) (arguing that trial judge was biased by presiding over several other hearings involving the child prior to the termination hearing). Accordingly, we do not find that the senior judge's recusal in this case was required.

*Denial of Continuance*

Mother also contends that the district court erred in failing to grant her a continuance in order to investigate possible placement options for D.L. and his half-brothers. A district court's ruling on a motion for a continuance will not be disturbed absent an abuse of discretion. *In re J.A.H.*, 285 Kan. at 384-85. As previously stated, a district court abuses its discretion when its decision is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) founded on an error of fact. *Frazier*, 296 Kan. at 755.

In addition, K.S.A. 2014 Supp. 38-2267(a) requires a district court to hold a hearing on a motion requesting termination of parental rights within 90 days of the date that such motion was filed. It further provides that the district court may grant a continuance only if it finds that it is in the child's best interests. K.S.A. 2014 Supp. 38-2267(a). Hence, we review Mother's request for a continuance in light of these standards.

The record reflects that on January 16, 2015, Mother filed a motion asking the court to postpone the hearing so that an ICPC investigation could be completed for "possible placement/permanent custodianship of the minor children with their paternal aunt." On January 20, 2015, the district court denied Mother's motion, stating that when it set the motion for hearing, it took into account the calendars of six attorneys involved in the case. The district court also explained that the outcome of the ICPC investigation had no bearing on the termination hearing and that it was "necessary and appropriate for the above named minor children to achieve a degree of stability and permanency that they may not have enjoyed since they were removed from their home almost a year ago."

When ruling on a motion for continuance, a district court must consider all the circumstances surrounding the request, particularly the applicant's good faith and showing of diligence as well as the lawsuit's timetable. *In re J.A.H.*, 285 Kan. at 385. And as previously alluded to, the Revised Kansas Code for Care of Children is to be liberally construed to "acknowledge that the time perception of a child differs from that of an adult," so courts must "dispose of all proceedings under this code without unnecessary delay." K.S.A. 2014 Supp. 38-2201(b)(4).

We note that Mother—through her attorney—initially agreed to the January 23, 2015, date for the termination hearing. Moreover, Mother was personally present and was represented by legal counsel at the hearing. In addition, as the district court found, it would not have been in the children's best interests to postpone the hearing when they

17

had been out of their parents' custody for over a year. As such, we do not find that it was an abuse its discretion for the district court to deny Mother's motion for continuance.

Affirmed.